ARTHUR A. AND FRANCES LYNCH, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59676.    Filed March 28, 1958.

*James A. Ronayne, Esq.*, for the petitioners.
*James J. Quinn, Esq.*, for the respondent.

TIETJENS, *Judge:* The Commissioner determined a deficiency in petitioners' income tax for the year 1950 in the amount of $21,947.14 and made additions to the tax under section 294 (d) (1) (A) and (d) (2) of the Internal Revenue Code of 1939, in the respective amounts of $1,970.15 and $1,316.83.   Certain adjustments made by the Commissioner were not contested.   There is one issue left for our consideration, namely, whether petitioners realized income from a transaction involving certain securities of the Algam Corporation. Petitioners concede that the additions to tax shall apply if any deficiency in tax is determined.

### FINDINGS OF FACT.

Petitioners are husband and wife residing in New York, New York. They filed a joint income tax return in 1950 with the collector of internal revenue for the second district of New York.

Petitioner Arthur Lynch, Nathan Herzfeld, and others organized the Yonkers Raceway.

The Algam Corporation, hereinafter referred to as Algam, was incorporated in 1948 or 1949.   Arthur was one of its original stockholders.   Algam owned the property upon which the Yonkers Raceway is located.   Algam leased such property to the Yonkers Raceway on a percentage of receipts basis.

Ben Morris and Arthur have been friends since about 1946 or 1947. During July or August 1949 Ben became interested in buying some Algam stock.

Arthur knew all of the stockholders of Algam. During 1950 he was a member of Algam's executive committee and received a $20,000 salary for his services.

Ben approached Arthur and told him that he and some of his friends wanted to buy some Algam stock and that he and Arthur would be "partners" in the deal.

Ben and Arthur organized the Lincoln Trading Corporation, hereinafter referred to as Lincoln, to hold moneys received by Ben from his friends who wanted to purchase a portion of the Algam stock to be acquired. Lincoln was a dummy corporation. It never issued any stock.

Arthur contacted Algam's stockholders to determine whether any of them were interested in selling their Algam stock. Nathan Herzfeld appeared to be the most likely prospect.

Arthur had known Nathan since about 1945. They had offices in the same building and saw each other frequently. During the last few months of 1949 and the first few months of 1950 Arthur negotiated with Nathan for the purchase of Algam stock. Ben also participated in some of the negotiations though he was not as active as Arthur and he never negotiated with Nathan unless Arthur was present. Ben did not become acquainted with Nathan until the latter part of 1949.

The negotiations were successful. Nathan arranged for his brother, Gerald Herzfeld, to sell a $6\frac{1}{4}$ interest in Algam to Arthur and Ben.

On March 15, 1950, Gerald and Arthur executed an agreement whereby Gerald sold to Arthur 25,000 shares of Algam class A common stock, 3,125 shares of Algam class B common stock, and $62,500 of Algam 6 per cent registered serial debenture bonds. The consideration for the securities was $250,000, of which $187,500 was paid for the stock and $62,500 was paid for the bonds.

The agreement recited that Arthur's purchase of the stock and bonds of Algam was made for the purpose of investment and not for resale. The agreement also stated that Gerald would request Algam to issue the certificates for the stock and bonds to Arthur or his nominee.

A rider was attached to the agreement which requested that Algam issue the stock and bonds as follows: 25,000 shares of class A common stock to Lincoln; 3,125 shares of class B common stock to Arthur; and $62,500 of 6 per cent registered serial debenture bonds to Arthur. Such rider was signed by Arthur and Ben.

Lincoln drew a check for $187,500 on March 16, 1950, to the order of Gerald, in payment for the Algam stock and bonds. Lincoln drew another check for $46,875 on March 24, 1950, to the order of Gerald, in payment for Algam stock and bonds. Arthur paid $15,625 to Gerald from his personal funds, to complete payment of the $250,000 purchase price called for in the purchase agreement.

Arthur retained the 3,125 shares of class B common stock of Algam. He also retained $40,000 of the Algam bonds.

Ben, on behalf of Lincoln, transferred 20,000 shares of class A common stock of Algam to his friends who had supplied part of the purchase price. Ben retained 5,000 shares of class A common stock of Algam. Ben also became the owner of $22,500 of Algam bonds.

About the time Lincoln drew its check of March 24, 1950, payable to Gerald, it borrowed $46,875 from the Prudential Finance Company. The loan was guaranteed by Arthur and was collateralized by the $62,500 in Algam bonds purchased from Gerald.

Algam class B common stock has voting rights. Algam class A common stock has no voting rights. Aside from this difference, the rights attaching to the ownership of either of those classes of stock are identical.

The fair market value of the Algam class A common stock and Algam class B common stock acquired from Gerald was $6.66⅔ per share at the date of purchase.

The fair market value of the $62,500 of Algam 6 per cent registered serial debenture bonds acquired from Gerald was $62,500 at the date of purchase.

The fair market value of the $40,000 of Algam bonds and 3,125 shares of Algam class B common stock retained by Arthur was $60,833.33 at March 15, 1950.

In 1950 Arthur received compensation for services in the form of Algam securities with a fair market value of $45,208.33.

## OPINION.

The Commissioner determined that the effect of the transactions in Algam securities, described in our Findings of Fact, was a purchase of such securities by Arthur for $250,000 and a subsequent sale by him of the 25,000 shares of Algam class A common stock plus $22,500 of Algam bonds to Lincoln (Ben and his associates) for $234,375, on which Arthur realized a short-term capital gain of $45,208.33 which is taxable to him at ordinary income tax rates. In the alternative, the Commissioner determined that Arthur realized ordinary income in the amount of $45,208.33 as a result of services rendered by him to Ben and his associates.

Petitioners argue that Ben and Arthur were engaged in a joint venture for the purpose of purchasing Algam securities and that as a result of such joint venture Arthur was able to purchase 3,125 shares of Algam class B common stock and $40,000 of Algam bonds for $15,625, and since Arthur did not sell any of those securities

during 1950, he is not taxable on them that year. Petitioners argue further that Ben and Arthur purchased the Algam securities together and divided the securities in an arrangement which was satisfactory to both and the fact that Ben sold part of his securities (20,000 shares of Algam class A common stock) to acquire funds to pay Gerald can have no effect on Arthur since Ben never paid anything to Arthur.

In determining the amount of petitioners' gain as a result of Arthur's alleged sale of securities to Ben and his associates or the amount of compensation received for services rendered to Ben and his associates, the Commissioner valued the Algam class A common stock and the Algam class B common stock at $6.66⅔ per share ($187,500 divided by 28,125 shares). The Commissioner valued the Algam bonds at their face amount. Petitioners do not object to the valuation determined (they regard it as irrelevant) and we think such valuation is proper. The purchase agreement, dated March 15, 1950, provided that the $62,500 of Algam bonds were sold for that amount and it also provided that the Algam stock (25,000 shares of class A common stock and 3,125 shares of class B common stock) was sold for $187,500. Since the rights attaching to the ownership of either class are identical, except that the class B common stock has voting rights and the class A common stock does not, we think the Commissioner's determination, that the shares of stock of each class had the same fair market value, is sound, and we approve it for the purpose of determining petitioners' income from the transactions in Algam securities during 1950, if any.

We need not consider the Commissioner's primary argument since we think his alternative argument is dispositive of the issue involved here.

The record demonstrates that the reason Ben approached Arthur with the proposition for purchasing Algam securities was that Arthur was in a position to have an inside track on such a purchase, i. e., he was one of the original subscribers to Algam stock, he was a member of Algam's executive committee, and he knew all of Algam's stockholders.

Once they agreed to purchase Algam securities, Arthur went to work. He contacted all of Algam's stockholders to ascertain their willingness to sell stock. Nathan appeared to be the most likely prospect and Arthur actively carried on negotiations with him for several months. Ben, who did not become acquainted with Nathan until about the time negotiations started, also participated in the negotiations, but he was not as active as Arthur. In fact he never negotiated with Nathan unless Arthur was present. Eventually it

was determined that Nathan's brother, Gerald, was willing to sell a 6¼ interest in the stock of Algam as well as $62,500 in Algam bonds for a total price of $250,000 and a purchase agreement to that effect was entered into between Arthur and Gerald. The agreement provided for a portion of the securities to be transferred to Lincoln, which in turn transferred the securities to Ben and his associates.

When the entire transaction was complete Arthur was the owner of 3,125 shares of Algam class B common stock and $40,000 of Algam bonds. Those securities had a fair market value of $60,833.33 at the date of the purchase; however Arthur had only paid $15,625 from his personal funds for those securities. Ben and his associates acquired 25,000 shares of Algam class A common stock and $22,500 of Algam bonds. Those securities had a fair market value of $189,166.67 at the date of the purchase; however Ben and his associates had paid $234,375 for them.

It is clear that Arthur and Ben did not form a partnership to purchase Algam securities and that there was no holding of the Algam securities by a partnership, thus there could not be a nontaxable distribution of Algam securities from a partnership to Arthur and Ben as partners.

Petitioners' argument that Arthur and Ben purchased the Algam securities in a joint venture and that Arthur should not be taxed on his share of the securities until he sells them is without merit. As we view the transaction, the fact that Arthur and Ben might have been members of a joint venture for the purchase of Algam securities is irrelevant. As contemplated by Ben and his associates, Arthur found an Algam stockholder interested in selling his stock and certain Algam bonds as well. Arthur was the primary negotiator in the purchase of such securities and he also paid only $15,625 toward the $250,000 purchase price. In return Arthur received Algam securities with a fair market value of $60,833.33. On the other hand, Ben and his associates paid $234,375 for the securities they received which had a fair market value of only $189,166.67. We think it is obvious that the $45,208.33 of Algam securities which Arthur received in excess of the amount he paid was payment from Ben and his associates for services rendered in finding a seller and arranging the purchase of the Algam securities which Ben and his associates acquired. Gross income, of course, includes compensation for services, and such income is realized if paid in the form of property.

We hold that Arthur received, in 1950, a compensation for services rendered, in the form of Algam securities with a fair market value of $45,208.33.

*Decision will be entered for the respondent.*