Melvin Mailloux and Abigail Mailloux v. Commissioner. Robert R. Foley and Mary J. Foley v. Commissioner.
Mailloux v. Commissioner
Docket Nos. 79473, 79474.
United States Tax Court
T.C. Memo 1961-188; 1961 Tax Ct. Memo LEXIS 161; 20 T.C.M. (CCH) 942; T.C.M. (RIA) 61188; June 23, 1961
Leland E. Fiske, Esq., Adolphus Tower, Dallas, Tex., for the petitioners. Graham R. E. Koch, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: A deficiency has been determined in the income tax of each of the petitioners for the year 1954 in the amounts as follows: Docket
No.
79473
Melvin and Abigail Mail-
loux
$26,942.83
79474
Robert R. and Mary J.
Foley
26,577.19
The sole issue for determination, which *162 is identical as to each petitioner, is whether or not respondent has erred in including in the income of each for the year at issue the fair market value at 50 cents per share of certain stock received by each during that year. Another issue pertaining to petitioner Mailloux is whether the respondent has erred in disallowing as a casualty loss deduction the amount of $1,043.20. Findings of Fact Such facts as have been stipulated are accordingly so found. Melvin and Abigail Mailloux are husband and wife and formerly resided at 10156 Baronne Circle, Dallas, Texas, and filed their joint income tax return for the calendar year 1954 with the district director at Dallas. Robert R. and Mary J. Foley are husband and wife and reside at 10135 Rock Moor Drive, Dallas, Texas, and filed their joint income tax return for the calendar year 1954 with the district director at Dallas. Melvin Mailloux, hereinafter referred to as Mailloux, and Robert R. Foley, hereinafter referred to as Foley, were in the securities business during the years 1952 through 1954. About the middle of April 1954, Critchell Parsons entered into a series of discussions with Foley and Mailloux regarding the financing *163 of a uranium venture and petitioners undertook to do certain things, such as assisting in clearing the issue of stock for sale in Texas, attracting private capital when it was in the private financing stage, and assisting in securing an underwriter for public financing. Parsons was the principal organizer of a corporation known as Rocky Mountain Uranium Corporation, hereinafter referred to as Rocky Mountain. He acquired uranium claims in his name and signed the purchase money notes therefor. These uranium claims, which were ultimately transferred to Rocky Mountain for stock, were owned by Beaver Lodge Oil Corporation and Gene W. Hewett, Clarence Spangler, Herman Lewis, and Parsons. Petitioner's' names did not appear on any of the documents showing ownership of the uranium claims. Petitioners' names did not appear on any of the notes given in acquiring these uranium claims. Petitioners did not have any ownership rights in those uranium claims. Rocky Mountain was incorporated on May 3, 1954. On May 18, 1954, rights acquired or to be acquired in certain mining claims were transferred to the corporation in exchange for 1,450,000 shares of its stock of 10 cents per share par value, *164 which stock was issued as follows: Number
Name
of shares
Critchell Parsons
900,000
Beaver Lodge Oil Corporation
450,000
Gene W. Hewett
40,000
Herman H. Lewis
40,000
Clarence J. Spangler
20,000
Total
1,450,000
On May 18, 1954, Parsons delivered to Mailloux and Foley two certificates, Numbers 3 and 4, for the 120,000 shares of Rocky Mountain stock each, or a total of 240,000 shares, out of his 900,000 shares issued in his name and endorsed in blank. The arrangement between petitioners and Parsons called for them to receive, in addition to the Rocky Mountain stock, 10 percent of monies raised by private sales of Rocky Mountain stock prior to the public offering and such private sales were to be at 50 cents per share. Petitioners received $12,000 in commissions under the 10 percent of sales arrangement. Uranium mining claims held by the corporation were Circle Cliffs No. 1 Group, Circle Cliffs No. 2 Group, La Sal Junction Group, Green River Group, Notom Bench Properties, and The Boyd Group. Petitioners actively participated in acquisition of the La Sal and Green River claims which were acquired on or about June 13, 1954. Parsons' purpose in transferring *165 240,000 shares of Rocky Mountain stock to petitioners was to compensate them for their services. It was the understanding between petitioners and Parsons that this stock would only be sold after mutual discussion and agreement. The purpose of this understanding was to prevent the destruction of the market by rapid liquidation. During 1954 both petitioners sold portions of their Rocky Mountain stock at prices ranging up to almost per share as follows: Melvin Mailloux
Number
Gross sales
Date
of shares
price
6- 1
8,275
$ 4,137.50
7- 1
2,500
450.81
11-24
1,000
699.92
11-24
3,500
3,499.67
11-26
1,000
1,062.42
12- 1
5,275
7,912.00
12-17
100
289.92
12-17
2,000
5,999.83
Total
23,650
$24,052.07
Robert R. Foley
6- 1
8,275
$ 4,137.50
8- 5
5,000
2,866.86
11-24
3,500
3,499.67
12- 1
5,200
7,799.50
12-17
2,000
5,999.83
12-17
400
1,199.92 [1]
Total
24,375
$25,503.28
The records of Rocky Mountain show that Parsons made the following sales of Rocky Mountain stock during the year 1954: Gross
Number of
sales
Date
Purchaser
shares
price
5-18
Mrs. E. B. Jansen
(Johnson)
50,000
$ 2,500.00
5-26
Parker Harrison
10,000
5,000.00
6- 1
Various Purchasers
82,500
12,000.00
6- 2
P. H. Leavell
10,000
5,000.00
6- 3
R. E. Houser
600
$ 300.00
6- 4
Sandra Parsons
500
50.00
6- 4
Misses Marshall and
Smith
625
62.50
6- 4
R. E. Allen
35,000
17,500.00
6- 7
Various Purchasers
6,500
3,250.00
6- 8
Mr. Ezzell
1,000
500.00
6- 9
Various Purchasers
12,000
6,000.00
6-10
Various Purchasers
5,000
2,500.00
6-14
Various Purchasers
2,000
1,000.00
6-17
Various Purchasers
2,000
1,000.00
6-22
Various Purchasers
8,000
4,000.00
6-25
M. C. Parsons
10,000
1,000.00
6-25
Various Purchasers
1,000
500.00
7-12
Peter Morgan
25,000
1,910.00
7-13
Various Purchasers
800
400.00
7-16
Various Purchasers
10,000
5,000.00
7-22
Various Purchasers
8,000
2,000.00
7-22
Various Purchasers
19,500
9,750.00
7-23
Various Purchasers
5,000
1,250.00
7-30
Various Purchasers
10,000
5,000.00
8- 2
Various Purchasers
200
100.00
8-30
Jenine Cooper
100
10.00
8-31
Various Purchasers
10,000
5,000.00
9- 7
Various Purchasers
6,000
1,750.00
10-20
Various Purchasers
2,000
1,000.00
10-27
Various Purchasers
6,500
6,500.00
10-29
R. J. Crowley
3,000
750.00
10-29
R. J. Crowley
200
100.00
11- 1
Norma J. Riddle
275
27.50
11-12
Various Purchasers
4,000
2,000.00
12- 1
Various Purchasers
3,000
1,500.00
12-21
Various Purchasers
5,000
2,500.00
12-28
Herman Lewis
60,000
6,000.00
Total
415,300
$114,710.00
*166 Mrs. E. B. Jansen (Johnson) was a friend of Parsons and the price which she paid for her shares was set arbitrarily and bore no relation to market price. Misses Marshall and Smith were employees of Parsons' company, Beaver Lodge Oil Corporation, and were given a preferential price on the shares they acquired. M. C. Parsons was a relative of Parsons and was given preferential treatment on the purchase of Rocky Mountain stock. Peter Morgan was the underwriter of Rocky Mountain stock and was given a special price as an incentive on the stock which he purchased for himself. Jenine Cooper and Norma Riddle were also employees of Parsons. Herman Lewis was one of the original organizers and a director of Rocky Mountain. In addition, he was mining superintendent of Rocky Mountain and in charge of field operations and because of this, he was given an option on 60,000 shares of Rocky Mountain stock at 10 cents per share as an incentive. The records of Rocky Mountain show that the corporation made sales of Rocky Mountain stock during the year 1954 as follows: Gross
Number of
sales
Date
Purchaser
shares
price
5-13
Critchell Parsons
50,000
$ 5,000
5-20
R. Paul Cressen
22,000
11,000
5-24
William T. Townsend
100
50
5-24
Helen L. Johnson
200
100
5-24
Wendell Merritt, Jr.
200
100
5-24
George E. McCormick
200
100
5-24
D. E. Kester
1,000
500
5-24
W. E. Bondurant
1,000
500
5-24
Lucille H. Pipkin
1,000
500
5-25
Various Purchasers
4,000
2,000
5-28
Various Purchasers
29,100
14,550
6- 1
Various Purchasers
56,100
28,050
6- 2
Various Purchasers
30,010
15,005
6- 4
Various Purchasers
28,500
14,250
6- 7
Various Purchasers
2,000
1,000
6- 8
Various Purchasers
300
150
6- 9
Various Purchasers
38,700
19,350
6-17
Various Purchasers
10,000
5,000
6-18
Turner, White, At-
wood, McLane &
Travis
8,000
4,000
6-18
Julian M. Meer
9,500
4,750
6-25
Various Purchasers
13,500
6,750
6-29
Various Purchasers
10,000
5,000
6-30
Various Purchasers
3,500
875
6-30
Various Purchasers
35,700
17,850
Total
354,610
$156,430
*167 Petitioners, as salesmen, actually sold Rocky Mountain stock in May and June of 1954 at 50 cents per share. On August 23, 1954, Peter Morgan & Company, as underwriters, offered for sale 210,000 shares of Rocky Mountain stock at $1.15 per share. A national market for Rocky Mountain stock existed at least as early as November of 1954 with a price range in that month being from 1 1/8 to 3 3/8. Later in October 1954 a disagreement developed between Parsons and petitioners over the stock that petitioners had received in May. This disagreement arose as a result of petitioners' failure to obtain a clearance for the public sale of Rocky Mountain stock in Texas and the fact that an underwriter for such public sale generally had not been obtained. In December 1954 Parsons placed a stop order with the transfer agent on the transfer of petitioners' Rocky Mountain stock and in 1955 the transfer agent filed suit to determine ownership rights as between Parsons and petitioners. This suit was settled in May of 1956. Mailloux's garage burned in 1954, destroying some household goods stored therein. After the fire Mailloux made up a list of items stored in the garage from memory and placed *168 values thereon based upon his own opinion. On their income tax return for the calendar year 1954 the Foleys reported no income as a result of their receiving 120,000 shares of Rocky Mountain stock in May of that year. Upon audit, the respondent determined that the stock represented additional income to the Foleys in the amount of $60,000, with the following explanatory paragraph: (a) It is determined that you realized income in the amount of $60,000.00 from the receipt of 120,000 shares of the capital stock of Rocky Mountain Uranium Corporation as compensation for services rendered or to be rendered to such corporation. In their income tax return for the calendar year 1954 the Maillouxes reported no income as a result of having received 120,000 shares of Rocky Mountain stock in that year and, in addition, deducted from their income a casualty loss of $1,564.80 for fire damage based upon estimated replacement cost new, less 20 percent depreciation. Upon audit the respondent determined that the stock represented additional income to the Maillouxes in the amount of $60,000 and also determined that the casualty loss did not exceed $521.60, with the following explanatory paragraphs: *169 (a) It is determined that you realized income in the amount of $60,000.00 from the receipt of 120,000 shares of the capital stock of Rocky Mountain Uranium Corporation as compensation for services rendered or to be rendered to such corporation. (b) It is determined that you had a deductible casualty loss as the result of a fire not to exceed $521.60, rather than $1,564.80 claimed on your return. * * * Petitioners each received 120,000 shares of Rocky Mountain stock in 1954 as compensation for services. At the time such stock was received it had a value of at least 50 cents per share. The fair market value of household goods of petitioner Mailloux completely destroyed by fire in the year at issue was not greater than $521.60. Opinion Petitioners have not reported as income the fair market value of the Rocky Mountain stock received by them on May 18, 1954, from Parsons. They point to section 351(a) of the Internal Revenue Code of 1954[1] as their authority for not so doing, claiming that they, being members of a joint venture which owned mining claims which were contributed to Rocky Mountain in exchange for its stock, have transferred property for *170 stock within the meaning of that section which makes such an exchange nontaxable. Respondent contends the stock received by petitioners was in payment for services rendered by them; that they were not members of the joint venture and therefore owned no interest in the mining claims held by it and cannot be held to have transferred interests in such mining claims for the stock received by them. Petitioners' proofs relative to their relationship to the joint venture are not persuasive that they were at any time prior to and including May 18, 1954, members thereof. They had performed no services *171 in acquiring mining claims by that date. From the form of the transactions whereby the venture acquired the mining claims afterwards contributed to Rocky Mountain for stock of that corporation, it seems fair to conclude that they were not considered to be such members because neither of their names appears upon the transfer documents as owners of such claims nor were they named as obligors upon notes given in the acquisition thereof. Although others who were concededly joint ventures had likewise performed no services in acquiring mining claims, they were each issued stock in exchange for such claims by the issuing corporation while no stock was issued to petitioners. This appears to be consistent only with the conclusion that petitioners contributed no interest in the claims and that those to whom the stock was issued had done so and prior thereto had been the owners of transferable interests therein. Petitioners' proofs fail to rebut such a conclusion. It follows by a process of elimination that petitioners received their stock from Parsons, whether he was acting personally or as agent for Rocky Mountain, for services rendered and to be rendered by them in aiding in the financing *172 of the mining venture, assisting in clearing with Texas State authorities the sale to the public of the corporation's stock, attracting private capital, and assisting in the securing of an underwriter for the public sale of stock. We are strengthened in this conclusion by the fact that when a dispute later arose between Parsons and petitioners relative to the sale by petitioners of their stock, Parsons sought return of a portion thereof at least partly for the reason that no State clearance had as yet been obtained by petitioners for the public sale of Rocky Mountain stock. When petitioners, subsequent to the formation of Rocky Mountain and the receipt of stock from Parsons, assigned to him a portion of their stock in the acquisition of an additional mining claim, we think they did so extrinsic of any former arrangement they may have had with Parsons, the joint venture, or Rocky Mountain, in an effort and with the intention of acquiring an ownership in such additional claims. Having so concluded, it is then necessary to determine the fair market value of the stock received by petitioners on May 18, 1954. Arthur A. Lynch, 29 T.C. 1174; Allen v. Commissioner, 107 F. 2d 151; *173 Whitlow v. Commissioner, 82 F. 2d 569. Petitioners contend that should we find they received their stock in consideration of services rendered and to be rendered, we must nevertheless hold that it had no ascertainable fair market value on the date they received it because of the alleged restriction upon its sale placed upon it by Parsons. We think the record amply demonstrates the fallacy of this contention. Whatever restrictive arrangement existed between Parsons and petitioners relative to the sale of their stock was for the purpose of maintaining the market value thereof and was to their mutual benefit. It is clear that no absolute restriction against its sale was contemplated, but only that sufficiently small amounts should be offered for sale at any one time that the market therefore would not be depressed. In fact, petitioners and Parsons both disposed of substantial portions of their stock in 1954. If an enforceable restriction upon the sale of petitioners' stock existed, its practical effect was not sufficient to affect its fair market value. In fact, so far as it is shown by this record, until late in 1954, petitioners' sales of their stock were not affected *174 thereby. It seems doubtful too that, in view of the unequivocal agreement by Parsons to transfer stock to petitioners in return for their services, a binding restriction upon its sale by them could not have been effectuated by Parsons. This is borne out to some extent by his transfer of the stock endorsed in blank. We conclude that such restrictions upon petitioners' stock as may have existed had no bearing upon its fair market value when they received it. Was the fair market value of the stock on May 18, 1954, 10 cents per share as claimed by petitioners or was it at least 50 cents per share as claimed by respondent. We think it was at least 50 cents per share. Sales of stock within a reasonable period either prior or subsequent to a valuation date are strong evidence of its fair market value on that date. American Wire Fabrics Corporation, 16 T.C. 607; Estate of Leonard B. McKitterick, 42 B.T.A. 130. We have ample evidence of such sales here. Rocky Mountain records disclose sales of 354,610 shares during 1954 ranging in price from 10 cents to 50 cents a share. *175 Petitioners sold 48,025 shares of their stock during that period at prices ranging from 18 cents to $3 per share. Parsons during the same period sold 415,300 shares at prices ranging from 5 cents to $1 per share. Of all the shares sold, 475,460 were sold during the same period at 50 cents per share. When an underwriter had been obtained for the public offering of the stock, it was offered for sale at $1.15 a share. We find that the fair market value of the stock on May 18, 1954, was not less than 50 cents per share. Petitioners contend that should we conclude as above, they are taxable only upon that portion of their stock which was removed from sales restriction during 1954. Because, as we have held above, such restriction as may have existed did not affect the fair market value of petitioners' stock, it follows that this contention has no merit. On this issue, the respondent's determination is sustained. Petitioner Mailloux suffered the complete destruction by fire during 1954 of used household furnishings and equipment. In his return for 1954 he deducted therefor as a casualty loss the amount of $1,564.80. The Commissioner has disallowed $1,043.20 of that amount and has allowed *176 as such loss $521.60 which he contends represents the fair market value of the goods immediately prior to the fire. Mailloux is not an expert appraiser of used household furnishings and equipment. The amount of loss claimed on his return was arrived at by his listing from memory immediately after the fire the items destroyed, the valuing of each item by reference to advertisements of sales of such property, the totaling of such amounts, and an arbitrary deduction from such total of 20 percent thereof. We are not shown by the record what the destroyed items were and the record is silent as to their original cost and their age. That they were destroyed and that Mailloux thereby suffered a casualty loss is undisputed but, without more, he has failed to sustain his burden of proof, and we are therefore relegated to the principle laid down in Cohan v. Commissioner, 39 F. 2d 540, to dispose of the issue. We think respondent in his allowance of $521.60 has himself properly done so, and we sustain him upon this issue. Decisions will be entered for the respondent. Footnotes
1. Typographical error in this figure in Stipulation of Facts.↩
1. SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR. (a) General Rule. - No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.↩