R. Abbott Sinskey and Minna Sinskey, et al. [1] v. Commissioner. Sinskey v. Commissioner
Docket Nos. 3470-66, 3602-66, 6534-66, 6535-66.
United States Tax Court
T.C. Memo 1971-302; 1971 Tax Ct. Memo LEXIS 32; 30 T.C.M. (CCH) 1286; T.C.M. (RIA) 71302; November 29, 1971, Filed Nicholas H. Politan, 921 Bergen Ave., Jersey City, New Jersey, for the petitioners in Docket Nos. 3470-66 and 6534-66. Edward B. Maxwell, 2nd, and Burton Peskin, for the petitioners in Docket Nos. 3602-66 and 6535-66. William M. Gross, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined the following deficiencies in the petitioners' income taxes: Docket No.
Petitioners
Year
Deficiency
3470-66
R. Abbott Sinskey and Minna Sinskey
1960
$67,617.20
3602-66
CorpAmerica, Inc.
1960
24,084.11
6534-66
R. Abbott Sinskey
1962
7,586.85
and Minna Sinskey
1963
20,371.49
6535-66
Middlesex Trading
Corporation
1962
7,129.27
*33 The following issues are presented for our resolution: (1) Did petitioner CorpAmerica, Inc. (hereinafter referred to as CorpAm) incur a loss of $106,372.50 during the taxable year 1960? (2) Did petitioner R. Abbott Sinskey (hereinafter sometimes referred to as Sinskey) realize taxable income of $130,380.00 in 1960 as a result of certain stock purchases allegedly made for less than the fair market value of the stock at the time of purchase? (3) Did Sinskey realize taxable income in 1962 and 1963 in the amounts of $13,414.50 and $5,740.00, respectively, as a result of the payment of rent and other expenses by Middlesex Trading Corporation (hereinafter referred to as Middlesex) on an apartment leased by Middlesex but used primarily by Sinskey? Correspondingly, is Sinskey entitled to deduct any part of the payments made by Middlesex and himself for rent on this apartment in 1962 and 1963 as an ordinary business expense under section 162(a), I.R.C. 1954? (4) Is Sinskey entitled to deduct $21,700 paid by him in 1963 to Middlesex in connection with his guarantee of a loan made by a third party to Middlesex? (5) Is Middlesex subject to taxation as a personal *34 holding company for the taxable year 1962? [2]
Findings of Fact Petitioners R. Abbott Sinskey and Minna Sinskey, husband and wife, filed joint cashbasis income tax returns with the district director of internal revenue at Newark, New Jersey, for calendar years 1960, 1962, and 1963. At the time their petition herein was filed, they maintained their legal residence at Newark, New Jersey. CorpAm is a corporation organized to do business under the laws of the State of Delaware, with its principal office located in Wilmington, Delaware. It filed an accrualbasis corporate income tax return for the taxable year 1960 with the district director of internal revenue, Wilmington, Delaware. At all times subsequent to 1955, it had 21,103 shares of nonvoting class A common stock issued and outstanding and 10,000 shares of voting class B common stock issued and outstanding. At all times between 1955 and 1958 and since 1965, all of the class B stock was registered in the name of Minna Sinskey. During the intervening period, this stock was registered *35 in Sinskey's name. Middlesex was organized under the laws of New Jersey on July 12, 1960. Its original shareholders of record were Abele Minutella, Ralph Huntington, and Max Kay. Middlesex's initial capital consisted of common stock without par value, with 10 shares issued and outstanding as follows: 1288 Huntington
4
$400
Kay
3
300
Minutella
3
300
Subsequent to the death of Huntington on October 2, 1961, Lillian Rosen was elected a director in his place and was noted as a shareholder in the minutes of the April meeting of shareholders. Sinskey was involved in the purchasing and selling of financial institutions, such as banks, savings and loan associations, and insurance companies. He was president of CorpAm throughout the years in question and was elected president of Middlesex on November 26, 1963. CorpAm's board of directors from 1960 through 1963 included Sinskey, Huntington, Kay, and, following Huntington's death on October 2, 1961, Lillian Rosen. In early September of 1955, Sinskey learned that 604 shares (representing 60.4 percent of the outstanding capital stock) of the First National Bank in Carteret, Carteret, New Jersey (hereinafter *36 referred to as Carteret) were available for purchase. At that time, CorpAm was interested in purchasing a bank to form the nucleus of a bank holding company, and Sinskey thought Carteret might meet CorpAm's requirements in this regard. On September 6, 1955, six days prior to a meeting of CorpAm's board of directors, Alan Turtletaub sent via Sinskey the following letter of CorpAm: I hereby agree to sell and deliver to CorpAmerica, its nominees or assignees 604 shares of the 1,000 shares of the capital stock of First National Bank in Carteret, Carteret, N.J. at and for the price of $165,000 payable as follows: (1) CorpAmerica, its nominees or assigns to pay to Pennsylvania Co. of Philadelphia, paying agent, $88,000 at which time Pennsylvania Co. will deliver to CorpAmerica its nominees or assigns 424 shares of said stock duly endorsed. At the same time the undersigned witll deliver to CorpAmerica, its nominees or assigns 170 shares of said stock duly endorsed, and on Oct. 7, 10 additional shares thereby making a total delivery of 604 shares. (2) Forty Seven ($47,000) Thousand Dollars in cash is to be paid to the undersigned on or before October 7, 1955 together with 1,200 shares *37 of the Class A shares of CorpAmerica, Inc. which shall represent full and final payment. CorpAmerica to have the option to pay the undersigned $77,000 in full and final settlement thus eliminating the issuance of the 1200 shares of CorpAmerica stock. If for any reason CorpAmerica, its nominees or assigns elects not to consummate the above transaction the undersigned agrees to repay to CorpAmerica, its nominees or assigns, the aforesaid $88,000, with interest at 6% per annum, paid to the Pennsylvania Co. of Philadelphia, Pa. in pursuance hereof, not later than November 7, 1955, provided that CorpAmerica its nominees or assigns notifies the undersigned by registered mail sent to 386 Smith St., Perth Amboy, N.J. of its or their election not to consummate said transaction on or before October 7, 1955. On September 12, 1955, CorpAm's board of directors were informed of the proposed purchase. Sinskey reported that he had paid Pennsylvania Co. $88,000, as per the terms of the Turtletaub letter and the ensuing discussion revolved around whether CorpAm should proceed with the purchase. The following proposal was unanimously adopted by CorpAm's board of directors: (1) That Mr. Sinskey, *38 personally, complete the cash terms of the Turtletaub proposal; (2) That CorpAmerica, Inc., issue the 1200 shares of its Class "A" Common stock, receiving. therefor, credit in the amount of $30,000.00, Turtletaub agreeing not to sell, transfer or otherwise dispose of the whole or any part thereof for a period of three (3)years from date of issuance of said shares; (3) That Mr. Sinskey take title to and delivery of the said 604 shares; (4) That Mr. Sinskey, simultaneous with delivery to him of the said 604 shares agree to execute a formal option agreement to CorpAmerica, Inc., at and for the sum of $165,000.00 plus interest and other costs incurred by him, growing out of his financing of the transaction; (5) That the said option be for not less than fifteen months from October 7, 1955; (6) That CorpAmerica, Inc. shall have the right and privilege of making payments against said option in such amounts and at such times as it may desire; (7) That CorpAmerica, Inc., pay to R. Abbott Sinskey the sum of $75,000.00 upon the execution of the option agreement, said $75,000.00 payment to include the $30,000.00 credit resulting from the issuance to Turtletaub of 1200 shares of its *39 capital stock. 1289 On October 13, 1955, Sinskey sent the following communication to CorpAm: * * * I hereby agree and undertake to give to CorpAmerica, Inc., at any time within 15 months from the date hereof, the right to purchase all of the shares of said stock held by me except such stock as I shall retain to qualify as a director, but not less than 51% of the stock of the said First National Bank in Carteret, N.J., at the price per share fixed in the Turtletaub agreement plus any interest, costs and expenses laid out and expended to consummate the same plus or minus any loss or profit on the sale by me of any of the said 604 shares of the stock of the said First National Bank in Carteret, N.J. Of course you shall have the privilege of making payments on account of the purchase price, title however to be held by me until payment is made in full. On January 11, 1956, the terms of the offer therein were accepted by CorpAm at a meeting of its board of directors, and, as of February 3, 1956, $155,000 had been paid to Sinskey on account of this option. In late 1959 or 1960, Sinskey began negotiations with Benjamin B. Hersh for the purchase of a majority interest in the outstanding *40 stock of the Perth Amboy National Bank (hereinafter referred to as P.A.). Hersh represented a group of P.A. shareholders (hereinafter referred to as the "Gleiberman group") who held 24,000 of the 25,000 outstanding shares of that bank. Sinskey had made previous efforts to purchase a controlling interest in this bank as early as 1948 or 1949 but had been unable to agree with the sellers upon a price for the stock. Sinskey envisioned acquiring a controlling interest in P.A., causing P.A. to be merged with Carteret, and transferring the resulting interest in the merged institution to CorpAm. Sinskey believed that CorpAm itself could not buy the P.A. stock because it had an interest in Carteret, and, under New Jersey law, Sinskey believed that if CorpAm owned 25 percent or more of one bank, it could not own more than 10 percent of another. However, Sinskey did not want to pay more than $50 per share of P.A. stock and did not want to purchase more than 51 percent of its outstanding stock. The Gleiberman group, on the other hand, insisted upon the sale of all of the shares available at $65 per share. On April 25, 1960, Sinskey informed CorpAm's board of directors that he had tentatively *41 reached an agreement with the Gleiberman group whereby he could acquire a controlling interest in P.A. for $630,000 ($50 per share) and outlined the following plan to them: (1) submit to Perth Amboy stockholders, a proposal to purchase approximately twelve thousand six hundred (12,600) $20.00 par value shares out of the twenty-five thousand (25,000) shares outstanding, at and for a price of approximately fifty ($50.00) dollars per share; (2) if it became necessary for him to acquire more than twelve thousand six hundred (12,600) shares, he would acquire the services of a reputable New York broker for the purpose of selling off the shares in excess of the twelve thousand six hundred (12,600) majority shares; (3) in order to secure one hundred (100%) percent financing, he would, if necessary, personally pledge additional security, over and above, the twelve thousand six hundred (12,600) shares and personally guarantee payment of the purchase money loan; (4) if he is successful in obtaining the twelve thousand six hundred (12,600) shares, he plans to reduce the par value to ten ($10.00) dollars per share, thereby increasing the twelve thousand six hundred (12,600) shares to twenty-five *42 thousand two hundred (25,200) shares. [3] He then proposes to merge the First National Bank in Carteret (N.J.) with the Perth Amboy National Bank and as a result of such merger, he would obtain an additional four thousand five hundred (4,500) shares of ten ($10.00) dollar par value stock in the merged institution, via the exchange of the Carteret stockholders shares; (5) assuming that the foregoing was accomplished approximately as outlined above, the merged institution would have a capital account with a book value in excess of one million eight hundred thousand ($1,800,000.00) dollars and total resources in excess of twenty-six million ($26,000,000.00) dollars. He offered an option to CorpAmerica, Inc. on the twenty-five thousand two hundred (25,200) shares, plus the four thousand five hundred (4,500) shares at and for a total price of one million one hundred sixty-five thousand ($1,165,000.00 dollars. For this option, CorpAmerica, Inc. would agree to pay him approximately three hundred fifty-five thousand 1290 *43 ($355,000.00) dollars. Upon the acceptance and signing of such an option, CorpAmerica, Inc. would first apply against the total purchase price, the $155,000.00 already paid to Sinskey for the Carteret option of 1955. An additional sum of two hundred thousand ($200,000.00) dollars would be immediately paid or made available to Sinskey, making a total payment of three hundred fifty-five thousand ($355,000.00) dollars against the total purchase price of one million one hundred sixty-five thousand ($1,165,000.00) dollars. Mr. Sinskey explained that the necessity of obtaining a broker to dispose of the minority shares arose from the fact that the owners of the Perth Amboy stock refused to break their holdings and insisted on disposing of their total interest as a single block. In as much as the original contract called for the purchase of the control only, some provision was necessary to dispose of the minority interest. A price of forty ($40.00) dollars per share for the ten ($10.00) dollar par value shares was discussed with the brokers as a basis from which to work. He also made it clear that the brokerage transaction was strictly on the basis of a merged bank only and comprehended *44 no discussion of the shares of the two individual banks as such. CorpAm formally approved the proposal and authorized Sinskey to draw upon CorpAm the sum of $355,000 to carry out its terms. At a later date, CorpAm formally cancelled the Carteret option and charged the $155,000 already advanced to Sinskey against the $355,000 to be advanced to Sinskey for the P.A. - Carteret option. Sinskey expected to make a $370,000 profit on the transaction, computed as follows: Sale price to be paid for Sinskey's interest in stock of P.A. - Carteret:
$1,165,000
Less:
(a) Cost of Carteret stock
165,000
(b) Cost of P.A. stock
[4] 630,000 *45 795,000
Profit
$ 370,000
On November 30, 1961, Middlesex entered into a six-year lease effective January 1, 1962 of an apartment located at 625 Park Avenue, New York City, New York. The rent, payable in monthly installments, was $12,000 per annum for 1962 and 1963 and $13,000 per annum thereafter. Sinskey personally guaranteed the payments under the lease. During 1962 and 1963, Sinskey and his wife maintained residential apartments in Wilmington, Delaware, and Newark, New Jersey. The New York apartment originally contained five rooms and underwent renovations during 1962 and part of 1963. During the period of renovation, the only furnishings contained therein were a cot, a table, and several chairs. After renovations were completed in June or July of 1963, Sinskey and his wife refurnished the apartment to give it a "prestige" look. This refurnishing included the transfer of a substantial part of their own valuable antique collection to the premises. Sinskey and his wife stayed overnight in the apartment whenever a conference ended *46 late or 1292 whenever Sinskey saw his doctor in New York. Sinskey was suffering from a heart condition which caused periodic blackouts, and his wife was his constant companion during this time. During 1962 and 1963 Middlesex paid $12,000 and $11,000, respectively, for rent on the apartment. Sinskey and Middlesex deducted the following amounts as rent for this apartment: *13
Amount
Amount deducted
Year
paid
Sinskey
Middlesex
1962
$12,000
$12,000
1963
11,000
$6,000
[6] 5,500 In addition, Middlesex deducted $1,414.50 in 1962 and $240 in 1963 as "operation and maintenance expense" for the apartment. Also in 1963, Sinskey made payments to Middlesex in the amount of $21,700 in connection with his guarantee of the loan to Middlesex made by Philadelphia. [7] This amount consisted of $14,500, representing the difference *47 between the price received by Middlesex from the sale of certain P.A. shares and the $40 per split share required to pay Philadelphia, $4,100 purportedly owed to Sinskey as commission, and $3,100 representing the cost to Sinskey of 190 P.A. shares previously loaned by Sinskey to Middlesex. Ultimate Findings of Fact In acquiring the Carteret shares, Sinskey was, at all times pertinent, the agent of CorpAm rather than a purchaser in his own right, with an option in CorpAm to acquire such shares from him at his cost. At all times pertinent, Middlesex was a viable corporate entity acting on behalf of CorpAm in the acquisition of shares of P.A. The fair market value of a P.A. share on the date of acquisition by Sinskey was $65 per share. The Park Avenue apartment rented in the name of Middlesex was primarily intended and used for the personal benefit of the Sinskeys and only incidentally for the business purposes of Middlesex and Sinskey. The payments by Middlesex, other *48 than for its own incidental purposes, constituted compensation to Sinskey for services rendered to Middlesex and/or CorpAm. Opinion 1. CorpAm's Claimed Loss for 1960 CorpAm has now conceded the correctness of respondent's disallowance of the long-term capital loss of $106,372.50 which it claimed in its return for the taxable year ended December 31, 1960 in respect of the P.A. shares held by Middlesex. It now asserts, however, that it is entitled to an ordinary loss in the same amount. CorpAm's position is that it sustained an ordinary loss under section 165(a) [8] because of its obligation to absorb all losses in connection with the 7,091 1/2 shares of P.A. still held by Middlesex on December 31, 1960 and that a loss of $15 per share was a reasonable and realistic accrual of the loss which Middlesex would suffer on the later sale of said shares, based on the decrease in value of P.A. shares due to the Comptroller's disapproval of the intended merger. CorpAm does not dispute that, as of December 31, 1960, 7,091 1/2 shares of P.A. remained unsold. Clearly, Middlesex had no loss on these shares as of *49 December 31, 1960. [9] It is well established that a loss must be evidenced by a completed and closed transaction. United States v. White Dental Co., 274 U.S. 398 (1927); Monroe W. Beatty, 46 T.C. 835, 838 (1966). Mere diminuation in value does not qualify. Monroe W. Beatty, supra; George N. Crouse, 26 B.T.A. 477, 481 (1932); White Star Line, 20 B.T.A. 111 (1930); Reggio v. United States, 151 F. Supp. 740, 741 (Ct. Cl. 1957). The Comptroller's disapproval of the merger at most diminished the value which P.A. stock might otherwise have had; it did not create a closed transaction giving rise to a deductible loss. Indeed, until Middlesex actually sold the shares of P.A. still held by it, it sustained no recognizable loss. Johnson, Drake & Piper v. Helvering, 69 F. 2d 151, 156 (C.A. 8, 1934); F. Russell 1293 Beebe, Et Al., Executors, 15 B.T.A. 1022, 1025 (1929). *50 2. Income to Sinskey In his deficiency notice, respondent asserted that Sinskey had realized income in the amount of $106,372.50 from the issuance of a note by CorpAm to Middlesex on December 30, 1960. This claim has now been abandoned by respondent. In his amended answer, respondent claimed an increased deficiency based on the receipt of taxable income in the amount of approximately $130,000 as the result of an alleged bargain purchase of P.A. stock in 1960. [10] Since this issue was first raised by respondent in an amended answer, he has the burden of proof. Rule 32, Tax Court Rules of Practice; Estate of Ben Stone, 50 T.C. 113, 122 (1968). The main thrust of respondent's argument is that, on the basis of these facts and the circumstances revealed by the record *51 as a whole, the difference between the price paid by Sinskey and the fair market value of the shares represented compensation for services and consequently constituted ordinary income. Sinskey counters with the assertion that he was nothing more than a bargain purchaser within the ambit of Palmer v. Commissioner, 302 U.S. 63 (1937). Three facts are clear. As our findings of fact reveal, Sinskey bought the P.A. shares for $54.57 per share, the shares had a fair market value of $65.00 per share, and Sinskey was a key figure in arranging for the purchase and in the efforts to bring about a merger between Carteret and P.A. Based upon the foregoing facts and our evaluation of the testimony of the witnesses and the record in its entirety, we hold that the respondent has carried his burden of proof. We think that the following factors, among others, buttress our conclusion: (1) In expressing its doubts, which ultimately caused it to change its mind about the purchase of the minority shares, APR pointedly referred to the fact that, in selling such shares, it would have to be made clear that Sinskey "had made a contribution to the merged organization to justify the cheaper *52 price at which you [Sinskey] individually bought the Perth Amboy National stock." (2) Middlesex was viewed as only a temporary repository of the shares and was at all times a creature of CorpAm. CorpAm's agreement to absorb any losses on the ultimate disposition of the shares by Middlesex served as assurance to Middlesex that it would have sufficient funds to liquidate its loan from Philadelphia. Under these circumstances, Sinskey took little, if any, risk in personally guaranteeing the loan. (3) Sinskey's assertion, that the excess value paid by Middlesex represented the prospect of economic advantage from the merger and was not realized in a tax sense unless and until the merger was consummated, might have some merit if respondent were claiming that he received income represented by the difference between the $54.57 per share which he paid and the $80.00 per share which Middlesex paid. But respondent is making no such claim. Rather, he is asserting that Sinskey received income measured by the difference between $54.57 and the $65.00 per share which the Gleiberman group demanded and was paid. This latter value was arrived at in an arm's-length negotiation and, in our opinion, *53 represented what the P.A. stock was worth, irrespective of what happened to the planned merger. The fact that, because of the subsequent unexpected turn of events, CorpAm relinquished its option and Sinskey undertook to repay the $355,000 which he had received does not detract from this conclusion. [11]
(4) Sinskey's contention that he was to be compensated by CorpAm only through the exercise of its option confuses cash realization with realization of income for tax purposes. The hard fact is that in 1960 he received property for less than he paid for it. It is clear that, under such circumstances, compensation can be involved. Cf. William A. James, 53 T.C. 63 (1969); William H. Husted, 47 T.C. 664 (1967); see W. H. Weaver, 25 T.C. 1067 (1956), at 1084. Compare Helvering v. Salvage, 297 U.S. 106 (1936), affirming 76 F. 2d 112 (C.A. 2, 1935); Fisher v. Commissioner, 209 F. 2d 513 (C.A. 6, 1954).[12]
*54 Sinskey's reliance on Palmer v. Commissioner, supra, is misplaced. That case 1294 involved a mere purchase without any element of compensation for services (see Commissioner v. Lo Bue, 351 U.S. 243, 248 (1956))[13] and is therefore clearly distinguishable. Admittedly, Arthur A. Lynch, 29 T.C. 1174 (1958), relied upon by respondent, reveals the compensatory element more vivdly but the facts herein are sufficiently clear to constitute that case as a solid foundation for our decision. 3. The New York Apartment The New York apartment was in the name of Middlesex, as lessee, but, as our ultimate findings of fact show, it was used during 1962 and 1963 primarily for the personal benefit of Sinskey and only incidentally for his business purposes and those of Middlesex. We have also found that, except for the incidental use of the premises for the business purposes of Middlesex, the payments represented compensation to Sinskey for services rendered to Middlesex and/or CorpAm.[14] Under these circumstances, the bulk of the rent payments by Middlesex must be included *55 in Sinskey's income for those years. Old Colony Tr. Co. v. Commissioner, 279 U.S. 716 (1929). Nor can Sinskey claim any basis for deductibility of any portion of these sums expended by him on the ground that they were made in pursuit of the business activities of Middlesex or CorpAm. Noland v. Commissioner, 269 F. 2d 108, 111 (C.A. 4, 1959), affirming a Memorandum Opinion of this Court, Jacob M. Kaplan, 21 T.C. 134, 146 (1953). Most of the evidence as to the use of the apartment for business purposes either of Middlesex or Sinskey was vague and unconvincing. Petitioners claim that because the testimony was uncontradicted, we must accept it. Clearly, this is not the case. E.g., Fleischer v. Commissioner, 403 F. 2d 403, 406 (C.A. 2, 1968); Arnold T. Anderson, 55 T.C. 756, 758 (1971). Based upon the entire record herein, we hold that Middlesex is entitled to a deduction of $300 in the taxable year 1962 and that $600 of the amount expended in 1963 was for its own business purpose, [15] to that extent, Sinskey did not receive taxable income in those years. On the same basis, we also hold that Sinskey is entitled to deduct *56 $360 for the taxable year 1962 and $900 for the taxable year 1963. Otherwise, respondent's determination as to the nondeductibility by Middlesex and Sinskey and the includability in Sinskey's income of amounts representing rent and operating expenses in respect of the New York apartment is sustained. Cohan v. Commissioner, 39 F. 2d 540 (1930). 4. Payments on the Guaranty Our findings of fact reveal that Sinskey made payments in the taxable year 1963 aggregating $21,700 in connection with his guaranty of Philadelphia's loan to Middlesex. The circumstances surrounding these payments are not satisfactorily disclosed on the record before us and we hold that Sinskey has failed to sustain his burden of proof. To the extent that Sinskey's deduction is based upon a claimed loss because of Middlesex's failure to reimburse him for his outlay *57 in connection with his guaranty, we note that there is no proof that Middlesex was unable to make such reimbursement. It was the beneficiary of CorpAm's promise to absorb any losses on the sale of P.A. shares and, to the extent that the payments were related to such losses, there is no evidence that CorpAm was unable to honor its promise. Moreover, the evidence indicates that Middlesex continued to be a viable entity for at least four years after the payments were made. In short, we are not satisfied that Sinskey's right of reimbursement under his guaranty became worthless in 1963. Consequently, respondent's determination is upheld. See Putnam v. Commissioner, 352 U.S. 82, 92-93 (1956). Decisions will be entered for the respondent in Docket Nos. 3470-66, 3602-66, and 6535-66. Decision will be entered under Rule 50 in Docket No. 6534-66. 1295 Footnotes
1. Cases of the following petitioners are consolidated herewith: CorpAmerica, Inc., Docket No. 3602-66; R. Abbott Sinskey and Minna Sinskey, Docket No. 6534-66: Middlesex Trading Corporation, Docket No. 6535-66.↩
2. On brief, Middlesex conceded the correctness of respondent's determination and this issue is therefore decided in favor of the Government.↩
3. This was, in fact done, but for clarity's sake, we have discussed the circumstances herein as if this increase in outstanding shares had never occurred.↩
4. Sinskey's ultimate cost for the P.A. stock was $682,445, still leaving him with a potential profit of $317,555 on the transaction. Prior to April 25, 1960, Sinskey and the brokerage house of Auchincloss, Parker & Redpath (hereinafter referred to as APR) had reached an informal agreement whereby APR would purchase the shares of P.A.,0 IN EXCESS OF THE AMOUNT CONSTITUTING A 51 PERCENT INTEREST, FOR $80 PER SHARE, WHICH, WHEN JOINED WITH Sinskey's purchase of the majority interest at $50 per share, would give the Gleiberman group their $65 per share price on the sale. APR's willingness to enter into this arrangement was predicated upon Sinskey's assurances that a merger between P.A. and Carteret would be accomplished within several months after the purchase of P.A. stock was completed and upon APR's own belief that they could sell their portion of the P.A. - Carteret stock at a price higher than their cost due to the attractiveness of the merger. On April 29, 1960, APR sent a letter to Sinskey in which they expressed serious reservations about holding P.A. stock prior to the accomplishment of the intended merger, although they continued to express their desire to sell P.A. - Carteret stock after the merger had been completed. At this point, CorpAm decided to buy the minority P.A. shares. Thereafter, Sinskey and CorpAm caused Middlesex to be formed for the purpose of acting as a temporary repository for the legal title of those shares. At a special meeting of the board of directors of Middlesex on July 13, 1960, the purchase of the excess shares of P.A. from the Gleiberman group for $80 per share was authorized. During this period of negotiations, Sinskey obtained a commitment from the Philadelphia National Bank (hereinafter referred to as Philadelphia) to lend him and Middlesex 100 percent of the funds necessary to effectuate the purchase of the P.A. stock made available by the Gleiberman group. On July 14, 1960, Sinskey consumated the purchase of the P.A. stock as follows: Sinskey bought 12,505 shares of P.A. stock from the Gleiberman group at an apparent cost of $682,445, or $54.57 per share. Middlesex received title to 8,692 shares, paying $695,360, or $80 per share. All of the funds for these purchases was supplied by Philadelphia. All of the P.A. stock was pledged as security, with Sinskey and his wife personally guaranteeing both loans. From the point of view of the Gleiberman group, Sinskey and Middlesex were purchasing 21,197 shares of P.A. stock for $65 per share, and any allocation of cost between Sinskey and Middlesex was of concern only to Sinskey and Middlesex. 1291 On July 25, 1960, CorpAm "accepted, approved and ratified" Sinskey's report of the aforementioned transaction and further stipulated that "any loss developing from the sale of these minority shares would be paid or assumed by CorpAmerica, Inc. and that any profit developing from the sale of said minority shares was to be paid to or made available to CorpAmerica, Inc." By the end of 1960, CorpAm had paid Sinskey a total of $355,000 (including the $155,000 previously paid on account of the Carteret option) on account of the P.A. - Carteret option. As of December 31, 1960, Middlesex had sold 1,600 1/2 shares of P.A. stock for $128,040, or $80 per share. In August of 1960, the necessary papers were filed for approval of the merger of P.A. and Carteret with the Office of the Comptroller of the United States. At all times between August of 1960 and January 3, 1961, all the parties involved in this transaction remained optimistic about the impending approval, and Sinskey himself had received informal assurances of its imminence from the regional comptroller's office and other governmental agencies. However, on January 3, 1961, a letter from the Comptroller was received withholding approval of the merger. Efforts to effect a reversal of that decision in the three months following receipt of the letter were of no avail. The merger was eventually consummated several years later. On January 23, 1961 CorpAm's board of directors relinquished their option on the P.A. - Carteret stock as of December 31, 1960 and Sinskey acknowledged liability to CorpAm for $355,000. In addition, Sinskey reported to the board that the Comptroller's decision had resulted in a loss of $106,372.50 to Middlesex on shares of P.A. still in its possession, the amount being computed as follows: Unsold shares
7,091 1/2
Loss of $15 per share ($80 - $65 times the number of unsold shares)
$106,372.50 This loss was apparently computed by taking Middlesex's cost reduced by the purported value of the stock in light of the failure to consummate the merger of P.A. with Carteret. Since CorpAm had agreed to assume any losses and receive any gains on the sale of the P.A. stock by Middlesex, CorpAm considered the loss fully accrued in 1960. Towards this end, CorpAm's books showed by journal entry, dated December 31, 1960, a balance of $355,000 in an account entitled "Notes receivable - R. Abbott Sinskey." This entry contained the following explanation: To set up receivable occasioned by cancellation of option on controlling stock of merged Perth Amboy - First National Bank of Carteret against which this amount has been paid. By journal entry also dated December 31, 1960, CorpAm credited $106,372.50 to a liability account entitled "notes payable" and debited the same amount to an account entitled "Loss on Perth Amboy-Carteret Option." The accompanying explanation reads: To set up obligation to assume loss under Perth Amboy - Carteret loss [sic] based on loss of $15 per share for 7,091 1/2 shares. In early 1964, CorpAm agreed to issue a note to Middlesex in the amount of $106,372.50 as "collateral" for its alleged obligations to Middlesex; Middlesex, in turn, agreed to turn this note over to Sinskey as security for "monies paid or obligations assumed" by Sinskey in liquidating the remaining minority shares of P.A. stock owned by Middlesex. The note, when issued, was backdated to December 30, 1960. CorpAm claimed a long-term capital loss in this amount on its return for its 1960 taxable year. The difference between the amount of loss claimed on the return ($106,377.50) and the amount claimed at trial ($106,372.50) has not been explained by any of the parties.
[5]↩
6. The discrepancy between the total amount paid for rent in 1963 ($11,000) and the $11,500 deducted by Sinskey and Middlesex for that same year is not explained in the record. We also note that Middlesex originally deducted the full $11,000 for 1963 but reduced that amount to $5,500 in an amended return. See also note 15, infra.↩
7. On his return for 1963, Sinskey deducted this amount as "Fees" under the designation "Outside Salesman's Expenses." The $6,000 rental payment was also deducted as rent in connection with this activity.↩
8. All references are to the Internal Revenue Code of 1954, as amended.↩
9. As our findings of fact show, every sale by Middlesex during 1960 was at a price of $80 per share and thus produced no loss.↩
10. Although the amended answer was filed more than six years after Sinskey's 1960 return was filed, the statute of limitations does not bar the assertion of an increased deficiency based upon a new ground since the original deficiency notice was timely. W. H. Weaver, 25 T.C. 1067, 1086↩ (1956).
11. We express no opinion as to the possible tax consequences to Sinskey of any payments on account of this sum in subsequent years, as no issue has been raised in this regard.↩
12. Compare also Owen G. Anderson, T.C. Memo. 1970-271↩.
13. Compare also James M. Hunley, T.C. Memo. 1966-66↩.
14. Since only the taxable year 1960 of CorpAm is before us, we have no jurisdiction with respect to the issue of deductibility of any of these payments by CorpAm. ↩
15. Middlesex showed a loss for the taxable year 1963 even after adjustments made by respondent. Consequently, no deficiency was asserted and that year is not before us.↩